May it please the Court, my name is Mike Goldfarb. I'm here for the Snohomish County Public Utility District. I'd like to save about three minutes, if I could, for rebuttal. Agency action should be set aside if it's arbitrary, capricious, or contrary to law. Let me briefly review what are the critical facts in this matter. FEMA first approved the 36 percent overhead rate that's in dispute in this case back in 1993, before the projects that were in issue here. Can I ask whether the money that was coming from FEMA was only for overtime or was it for overtime and straight-time work performed? I believe on most of the work it was for overtime, but I believe there was a piece that was also straight-time and it was emergency repair work or restoration. But I think the bulk of the work was done for overtime. There's a winter storm in 1995, and the sequence here is important. The District made an application for disaster relief. Then it did the work repairing the relief. Then it filed the paperwork with FEMA to get reimbursed for the work that it did. After it did that, FEMA specifically questioned a variety of different things in the proposed reimbursement, which included the 36 percent rate. The District provided information to FEMA, answered all its questions, and documented the basis of that rate. Then FEMA took that information, reviewed it at a first level, reviewed it at a second level, approved that 36 percent rate, and then sent the District a letter that said, this is the determination of the award. That letter, if the Court looks at it, you'll see says that where the work is 100 percent complete, that it is not an estimate but a final award. That exact sequence took place again a year later when there was a storm. The District noticed that it would seek reimbursement. It then did the restoration work itself. Then it met with FEMA, went through the entire project. FEMA people were on site. FEMA again looked at the 36 percent overhead rate. FEMA approved that rate after having all of its questions answered. Then FEMA sent a letter to the District that said, again, it's approved and it's final. In 1998, on both projects, the State of Washington, which was the intermediary here, sent a letter that said that both projects are eligible, final, done. Everything was fine until FEMA audited this project, which started in late 1999. The auditors came out and without any new or different information, essentially questioned the determinations that FEMA had made initially about the awards, and in particular, this 36 percent. Isn't that what auditors are supposed to do, question things? Well, absolutely. And the auditors don't need new information. I mean, that's why they're auditors. They look at the data and they try to figure out if there's some problem. I think Your Honor's question goes to one of the central points of the appeal and why the District has brought this action. Certain of the things that FEMA does are discretionary and certain of the things that FEMA does are mandatory in nature. When FEMA looks at a project initially, there could be three disaster projects out there. FEMA could look at all three of those projects and in its discretion say, this one gets an award, this one doesn't, none of them do, all of them do. That is a completely discretionary act by FEMA and not even reviewable. If FEMA's argument in this case is taken to its extreme, what it means is that that determination could be audited. Because what FEMA's saying is that everything that happens is subject to audit. I mean, I don't think that's what they're saying. And I don't see why I have to look at it. Maybe I'm missing something, but I'll just tell you what's on my mind and if you want to address it in the course of your argument, you can. It seems that FEMA made a determination to give relief and they gave relief based on some submission from the appellant. And then auditors come in and they question an overhead figure. Oh, the overhead figure. Well, 36% or whatever is applied to certain hours. Well, I'm viewing that as a normal auditing function. And if FEMA made a determination based on what was submitted to it, I don't see why the government can't audit that. If they find a problem, they say this has to be redone. So what's the big deal? Well, FEMA made a determination after it made a specific inquiry. So this is not the case where... Let's say FEMA relied on data submitted to it. It said our expenses are X. We made repairs based on the storm or whatever. We did it with our own employees. It took so many hours. We pay them a certain amount per hour and then we have a certain amount of overhead for fringe benefits. FEMA gets this and they approve it. Well, if it's false, or I'm not saying it's fraudulent, these accounting things, people have different theories and people can argue about it. But if the accounting is wrong, why can't the government audit it? The question is, is there a difference between an accounting error and a determination of eligibility? Now, we have no argument with the idea that FEMA should be able to come in and say, you told us 10 widgets, you only did 8. You owe us the money for the two back. I thought you told us your indirect expenses were 36 percent, but really they were only 10 percent. Well... Or 15 percent. Why can't they audit that? Because in this case, what they did was approved as eligible a category of cost, which was that number. But what happened in the... Well, in their briefing in front of the district court, they took the position that these were all eligibility determinations, and in fact, not even subject to review, because they were initial determinations of eligibility and therefore not reviewable by the district court. So, you know what? I mean, to me, that isn't addressing my point, is why can't the government audit a figure that's submitted on indirect cost? Government has... This comes up much more often in the government contracts area, which of course we're not dealing with here. But the government often gets submissions of costs, and some of them are indirect, and they're based on calculations, and there's an audit function. So here it's a different statutory scheme, but there's a government benefit to give redress for the damage from a storm. Why should the district get more than what its actual cost was of these hours? Well, it... Because... Well, there's a lot to say in response to Your Honor's question. First off, the district didn't get more than what its actual cost was for the hours. This is a sort of a complicated accounting problem. It has... So did the district actually pay the overtime workers, the fringe benefits? Well, here's the way it worked. The district... There's two ways you could do this. One way is you could take vacation, is a good example. The person works 40 hours a week, they get two weeks a year of vacation. So you take that number, you can just spread it over the straight time and have a number. That's one acceptable accounting treatment for how to do that. There's another equally accepted accounting treatment to take that vacation. So what you do is you say, how many hours did the person work straight time and overtime for the year? You take that number and divide it by the total. You take the total hours, straight time and overtime, and then you take that vacation and distribute it over all the hours. Is one more right than the other? It's a cost recovery paper method. Did the district actually spend the money for the vacation? Absolutely. Did the district... Was it appropriate for the district to prorate that and put some of that money on the hours that were worked for overtime on the government project? The answer under the OMB circular is as long as it's a reasonable rate, and that's what they do for everybody, and that's what the record in this case is. It's done consistently for everybody. That that's an example of how they specifically recognize that there can be allocation. And the government's position essentially is that you can't allocate or prorate those benefits, but... Okay, so what? I mean, there's more than one way it could be done. Why can't it be audited? And then it's a question of whether the agency is arbitrary and capricious in what they're doing. And that just seems like... It seems so basic. I don't mean to... I don't want to miss your argument, but having what I've read so far, I just don't get it at all. Okay. I don't think that the Court's questions are that different from the position that we're articulating. I think I probably agree with 95 percent of what the Court's saying. The question is why is this case different? If there was just a big pack of submissions and it just went through there and they initially approved the whole project and said that's fine, that would be one thing. But what happened in this case is between 1993 and 1997, on about a gazillion different examples at different points in time, this was specifically raised with FEMA. So there was an interchange. And our argument essentially is that there was some decision-making that went on here. So this wasn't a one-way street where, well, let's submit this application to you and then we'll respond. We submitted a case in supplemental authority that I think might be helpful for the Court to look at on this point. The case is called Microcomputer Technology v. Reilly. It's 139 Fed 3rd 1044. Here's what happened in that case. There was an educational, computer education company and they were providing training for prison inmates. And they were getting federal government money to do Pell Grants. And they were audited. The facts in this case. So they were getting these Pell Grants and the auditor came in, Inspector General, and said this is inappropriate. You have to refund this money. And the Court drilled into it and said some of these are clear violations and you have to give the money back. But with regard to tuition, there was an existing established policy of the Department of Education that said that the way it was being done was permissible. So this is what the Court said. The agency had written a prior memo. The demand for return of tuition was a departure from its former practices. And this is what the Fifth Circuit said about that. But where an agency makes a change with retroactive effect, the reviewing court must also determine whether application of the new policy to a party who relied on the old is so unfair as to be arbitrary and capricious. In that case, they said, look, we told you repeatedly that that's the way it was going to be done. We're not going to reverse ourselves now. What makes this case unique is the enormous dialogue that happened between the parties to establish this rate. This wasn't just a submission, here's what our rate is. This is what's your rate, how do you charge it, it's documented. If you look at the record here, all the backup was given to FEMA. They look at it, they say we've reviewed this, this is consistent with how they've been doing it for years. We've previously approved it, we're approving it again now. So what there was was a statement of policy by FEMA. And what we're talking about here is not an accounting issue where we're correcting a math error. What we're talking about here is a change in an interpretation of the way these regulations should be applied. And that's why this is problematic. And I hope that at least in part answers Your Honor's question. The point of the exercise here was that the this was an interpretation of their regulations. And they had interpreted in one way for a series of years. Then they turned around four years later on exactly the same record. Where is the change in policy? What was the new policy? Is that in the circular? Is that what you're talking about? Well, what I'm suggesting that the policy in this record is reflected by the fact that between 1993 and 1998 at least, they consistently said this is the way we're going to do it. Then what happened is the auditors came in and said we don't think this is reasonable. So we want to unwind this and do it a different way. That's what the Office of the Inspector General is for. Right. But what they're doing Is there a specific regulation that you contend was interpreted by the FEMA in communications to your client that then they issued a different interpretation of that regulation? Record doesn't reflect anything other than that it was deeply considered by FEMA that they clearly applied whatever regulations they thought were applicable and conveyed the result to us. It doesn't seem to be the same as that Fifth Circuit case. If there's not a specific regulation that says here's how fringe benefits will be computed by us, right? There's no regulation there that FEMA has that says when we reimburse somebody for their hourly costs, here's how we will determine fringes? FEMA's regulations in this matter Just answer that question. Is there a regulation that addresses this specifically? There are, yes. There are regulations in the OMB Circular A87 that address the payment of fringe benefits and how that should work. I would submit to you Did they change that regulation? They changed the way they were applying it. They changed the regulation? No. So doesn't the Office of the Inspector General have the right to go into any federal agency and say we think what you're doing is a mistake? Perspectively, absolutely. The question is when they have repeatedly assured the other party You can't have an estoppel normally against the government on something that's going to affect the government treasury. And if, exactly, and the Fifth Circuit solved that problem by saying depending on the degree of reliance, it can rise to the level of arbitrary and capricious. Well, I'm not all that interested in how the Fifth Circuit solved the problem. If what they've done here is arbitrary and capricious, then I would think you have a right to relieve. If it's not arbitrary and capricious, I think you don't. Well, I think we're I don't think there's any absolute prohibition in the law that says they can't audit their payments to people. This is the federal statute that addresses what happens in the event of deobligation. It says any funds paid to a grantee in excess of the amount which the grantee is finally be determined to entitle to under the terms of the award. I understand that, but what they were doing is they're giving you an award of reimbursement for certain hours of repair of storm damage. I guess what That their award is, I just don't understand the legal theory that their award is the exact way that you calculated your fringe benefits. Well, the award includes all of the specific items, and if Your Honors had a chance to look in the record at what But I don't see that the award is an official determination of how costs are to be calculated. Well, when they send you a letter that says that this is the final determination of the agency and a 60-day appeals clock starts running, and if you're in disagreement with any aspect of the way that that award has been determined that you can go forward and appeal, then they started some type of a clock toward finality. I mean, what we're suggesting here is that because of all of the communications back and forth for a variety of different reasons, the determinations that they initially made ought to be final. What if there had been fraud? Then you say no, not for fraud. Not for fraud. Why is there finality for something that's a mistake, but not for fraud? Because if we give them exactly the same factual record four years ago, they look at it, they review it at two levels, and they approve it, and we rely on it, and we budget on it, and we set our accounting for the future on it, and we hire people, we do all the things that we do on it. If they take exactly the same record that they had before, not anything different, and simply say, we said that, now we say this. I thought you were getting reimbursed for expenses in the past that were actually done for your hours spent making repairs. Yes. As opposed to budgeting for something you're going to do. But the way that the district did it at that time, it took all of these costs, and it's an actuarial process to come up with this number. So if the money gets taken away from the district now, it's a loss. I explained before about the cost allocation that was done. What you were getting reimbursed for, am I right? It was like repairs in the past? In other words, it wasn't like FEMA says, we're going to reimburse you for storm damage. You haven't yet made these repairs, but you can go out and do this, that, and the other thing? No, we did the work first. You did the work first. So I just don't understand your argument. On that point, that you budgeted for it, it was already done. What I'm saying is that the rate that was being used here was derived from a process. We try to say it a different way. The money here was actually spent by the district on these benefits. So when FEMA deobligates that money four years later, it has an impact on us because the district wants to take $800,000 away. We've got $800,000 of benefits that are paid in this case. We just used an accounting method to spread those over the hours. Now what FEMA is saying is that's too bad, we don't think those were actually incurred, so you lose those. Our point is that nothing changed, so for them to do that now based on the identical record is arbitrary and capricious. They're not correcting a mistake, they're not changing fraud, they're not doing anything other than just reinterpreting a regulation that they applied to us once. There are two parts to your argument, I believe, as I read the briefs. One is they shouldn't have changed. That's what you're stressing mostly. And the second is that what they did was wrong. That's correct. The second time. It's just wrong. It's just wrong. Okay. Well, we don't hear that much. And I'll proceed with that with your point of view. Thank you. May it please the Court, Catherine Hancock for Federal Appellees, the Federal Emergency Management Agency. I'd like to first start off addressing Judge Gould's questions. I think you hit the nail on the head, Your Honor. Here it was primarily projects for only overtime work. There was a small portion of straight time, non-emergency work included. But that is not at the heart of these claims. What was the overhead rate allocated to that straight time work? There, I believe, there was the 36 percent rate was. That's not enough. If you're going to cut the, if you're going to not pay the 36 percent for the overtime, then the straight time is going to have to be higher. Under their accounting system, that's correct. But we... Is there any other that you can suggest, I suppose? Well, let me address the fringe benefit rate that I think will answer your question, hopefully. Here in this case, they documented, they provided initially on the approval of the DSRs that a 36 percent rate, they applied a blended rate, and they had used that in the past. But when the OIG went in and actually looked at the costs documented that were paid out, the actual payrolls that were paid in fringe benefits to the employees on the grant, for these overtime workers, they were only paid at a 10 percent rate. So because the cost the district paid out on this project were not 36 percent, but 10 percent. Well, that depends on how you allocate the overhead. An overhead rate isn't paid, you don't pay it out and the salary is on the spot. It's an added cost that you, by which you calculate some fixed cost or something like that, or fringe benefits in this case. But if you go in, it may well be that there are employees who died and didn't get to use their vacation or something. You don't go and say, well, it wasn't a cost. This is an accounting method, it seems to me. And I don't know what it is in the regulations that I have seen that say that you can't account for fringe benefits by applying them over all the hours worked. I think in the cost provisions that provide for in these grants is that only actual costs paid out under the grant. Actual costs include overhead and overhead. Actual cost doesn't necessarily mean pennies paid out. It really doesn't. If you're talking in accounting terms, is when you attribute properly all the costs that go into a particular project. And some of those are going to be actual payrolls where you hand out dollars at the end of the day, and some of them are going to be overhead of various kinds, including fringe benefits, if they're fairly allocated to the thing. And I don't know why it's suddenly improper to allocate fringe benefits across the whole work. Well, in this case, Your Honor, I think our argument is that because this was primarily overtime work, and of course they were entitled to get fringe benefits to be reimbursed for fringe benefits for the overtime work. But here they were allocating straight-time costs for straight-time workers having nothing to do with this grant, but rather the fringe benefits that were incurred by them to pay straight-time workers for other regular district work that was not even a part of this grant. And the cost guidelines prohibit the federal government from paying fringe benefit costs or salaries that cannot be allocated to the work on this project. What provides that? What regulation or something? Well, the regulation in the CFR 13.22 provides for allowable costs, and that incorporates OMB A87, which ---- If I read A87, although it's virtually unintelligent ---- I'll agree with that, Your Honor. It says such benefits, whether treated as indirect costs or as direct costs, shall be allocated to federal awards and all other activities in a manner consistent with the pattern of benefits attributable to the individuals or groups of employees whose salaries and wages are chargeable to such federal awards and other activities. Now, I don't know why the word pattern and everything is in there if you're just saying we can only pay what you actually paid out. I think the key words in that provision, Your Honor, are groups of employees whose salaries and wages are chargeable to such federal awards. Well, the award that they got was for salaries and wages chargeable, salaries and wages of people who worked overtime. For overtime employees, not the straight-time employees. And so straight-time ---- That doesn't answer the question whether they're entitled to have allocated to their work some portion of fringe benefits across the board instead of just by straight-time. Your Honor, I don't believe that the benefits attributable to the straight-time employees, though their salaries are not chargeable to this federal award because it was overtime. Straight-time employees. I think if I understand the problem ---- I assume so in this case. If I understand the problem, it's I work eight hours today and then I go out and work overtime tonight and the government's picking up my overtime because it's an award for ---- it's a special work done for remedying a disaster. And how you allocate the whole package of fringe benefits I get for my regular work and my overtime work is a matter of accounting theory on which there may be several reasonable propositions. In which case ---- One, and it got approved, and now it's somehow wrong, but I don't see any regulation that says it's wrong. Well, it certainly, I think, within OMB 887, it's certainly not arbitrary and capricious for HEMA to have interpreted the provision this way. Nothing would be because we can't comprehend it. But you made a comment about you said these straight-time people were not working on the chargeable work, and earlier you said they were not working on the actual remedying of the disaster situation. How do you know that, and where's that in the record? The actual, the bulk of this, the grant, was only for emergency work, which only allows payment for overtime employees. Well, the thing, see, I actually worked directly with HEMA right after the Northridge earthquake, and the distinction you're making makes no practical sense to me at all, because we, the same employees, the very same people that were involved in cleaning up after the earthquake, in that emergency time period where it really was emergency, were the same people that had the regular jobs that were getting straight time, but they were working around the clock. And I don't know how you can say that from 9 to 5 they weren't working on the disaster, and then from 5 to 10 they were, and were going to allocate their reimbursement and fringe benefit charges based on that. Because there's really, as a practical matter, no difference. Everybody's working on the disaster when a disaster strikes. I believe there's a specific, I know there's something in the record, I can't remember where, I'd be happy to send a letter, which states that for utility repair, things like power stringing, the grants only cover the emergency work, which is considered the overtime work for the restringing. I guess there's Category B work and Category F work. Category B work is emergency repair work, I think, and Category F is for some permanent restoration work, which does include straight time and overtime. And there was a small portion of that included in this grant, but the bulk of the work and where we have the dispute over the overtime charges is involved with the Category B overtime work. I know I'm missing something, and so correct me if I'm wrong, but the way I was understanding it, if there's a storm and a bunch of lines get knocked down, there may be people on a utility's staff who are working on that during normal hours. They work on it during normal hours, they work on it in the evening. But the only thing they're getting special benefits for from FEMA is for the overtime stuff, that's like the working into the night. Do I have that right? That's exactly right, John. It's not inconsistent with Judge Wardlaw's query and saying, well, in practice, the same people are working day and night. It's true they're working day and night, but the only part that the utility gets the grant to compensate them for is the overtime. That's exactly right, Your Honor. Where does it say that? Where does it say that in this circular? I'm not sure. That's addressed in the circular, since the circular is just general accounting. I'm sorry? Where is that addressed? Where does it say that in this record? There is a provision in the state manual, which is incorporated in the PUD and FEMA agreements between the state and the district. And that is, I believe, in the administrative record, starting at page 2183. And that Washington State Public Assistance Manual indicates, sets out in there, costs, I believe, category B work and category F work, and sets out this distinction between overtime and straight time. And I believe it's also in the state administrative plan, which is in the record at 2148. Now, were these plans in effect at the time that FEMA approved the expenses originally? Yes, they were. You mean in 19, for these? When FEMA wrote all the letters saying this was okay, we approved. Yes, those were in effect. Okay. So if it was wrong to do it the way the district did it, then why did FEMA approve it? Here, frankly, I think what happened is oversight on FEMA's part. They were told by the district that this cost rate, this overhead rate, had been approved back in 1993 for a storm, which is true. What happened in that instance in 1993, the 36 percent rate was approved. However, that was a permanent category F situation, so there was straight time and overtime. And it was also never audited. So here the district provided FEMA with that information that the 36 percent rate had been approved before. The state inspector signed off on it, and then FEMA, through its review process, also signed off on that DSR. You know, I might be looking at this in an overly simplistic way, and I'm going to go back and study the regulations further and the circulars and the utilities. It seems to me the purpose of this kind of grant and the law, FEMA giving this, is to give the utility sort of like their marginal additional costs of doing these repairs at night to get over the catastrophe. And if that's – well, it might be true, as Judge Canby notes in his question earlier, that there are different accounting methods one could use to spread vacations and fringe benefits, whether it's a regular time or overhead time. But in this context, it seems like those indirect expenses that aren't directly attributable to the overtime shouldn't be included in terms of the intent of the grant. And even if it could be done in different ways, I don't see how one could say the agency is arbitrary and capricious in ultimately deciding that they made a mistake on the 36 percent, unless there's some legal principle, as is argued by appellants, that once they've approved the grant, they basically made an award of the calculation method. So is there any precedent that addresses that? In terms of whether it's – The method of calculating the cost is part of the – is an element of an award that's some official action. I don't think there's anything in the regulations or statutes that support that argument, Your Honor. By the way, is there any other proceeding going on relating to these events? Not that I'm aware of, Your Honor. I think exactly as you indicated, Your Honor, the purpose of these grants are to fund and reimburse the district for any additional incremental costs it incurs in providing – recovering from the disaster. It's not to cover any of their normal day-to-day costs or overhead expenses that they would already incur. It's hard in one place to use the term actual costs, I think. But actual costs does not necessarily mean marginal costs. No, that's correct. Actual costs may well embody various kinds of overhead that aren't marginal. When here, I think the way that FEMA looked at it is that the actual costs were – you know, the overtime employees were paid out at a 10 percent rate. So in their vision, that was the actual cost of paying the fringe benefits for the overhead employees. And I don't think there's anything to say that that's an arbitrary way of interpreting the actual cost guidelines and regulations in this case. If there are no further questions, I would rest on our briefs. Well, I have lots of questions, but I guess I'm going to have to do it on my own. So thank you very much. Thank you, counsel. You can have about a minute to reply because I believe you are over. I have two 30-second points. One, it wasn't an oversight by FEMA. This is not a field error. This was reviewed by FEMA on three different projects at two and in some cases three different levels of approval. So this is not an incidental mistake made by a field-level person. This is a consistent practice of applying this accounting treatment in the manner that it was done for a 1993 to 1998 time period and then a reversal without any change of anything in the year 2000. This is Circular A87. It's dated 1997. Was it in effect in 1993? I don't know the answer to that. Okay. And it was not included in the administrative record that FEMA produced. Okay. My other point, and I'll make it now in five seconds, is that the regulations specifically recognize, and I think Your Honor's question was dead on about that, specifically recognize the concept of allocating indirect costs to the award. And, in fact, the language in OMB 8711D5 says, shall be allocated, so it's mandatory, not discretionary. FEMA did this right the first time. For whatever reasons, the auditors saw it differently in 2000, but this was correctly interpreted the first time around and four years later shouldn't be set aside. Thank you. All right. Thank you very much, counsel. PUD District Number 1 versus FEMA will be submitted. KCV Moore is 20 minutes. All right. The court will take a short recess and then we'll take up KCV Moore. All rise. Thank you. Thank you. Thank you. Thank you.
judges: Canby, Wardlaw, Gould